**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TEMESGEN BELANGU,**<br><br>Plaintiff,<br><br>v.<br><br>**MG LIQUORS, INC.,** *et al.*,<br><br>Defendants. | Case No. 1:24-cv-354 (TNM) |

## <u>MEMORANDUM OPINION</u>

Temesgen Belangu claims that he was underpaid for his work as a cashier at Barrel

House Liquors.  So he brought a wage-and-hour lawsuit against Barrell House and its owner,

Mesfun Ghebrelul (collectively, "Barrel House").  The parties settled and now jointly ask the

Court to approve their settlement.  The Court will approve that settlement because it is a fair and

reasonable resolution of a bona fide dispute, not the product of employer overreach, and the

result of arm's length negotiating conducted by experienced counsel.

### I.

Belangu was employed as a cashier at Barrel House Liquors for just over four years.

Compl. ¶ 7, ECF No. 1.  Barrel House is a liquor store in Washington, D.C., owned and operated

by Mesfun Ghebrelul.  *Id.* ¶ 4.  As a cashier, Belangu worked the register, restocked shelves,

accepted deliveries, sold merchandise to customers, and prepared and delivered customer orders.

*Id.* ¶ 11.  He worked at Barrel House from September 2019 until his employment was terminated

in October 2023.  *Id.* ¶¶ 10, 20.

Barrel House set Belangu's schedule.  *Id.* ¶ 13.  While the exact number varied, Belangu

regularly logged over 60 hours a week.  *Id.* ¶ 14.  He was paid an hourly wage for this work.

When he was hired in September 2019, Barrel House promised that he would be paid around $14 per hour for his work. *Id.* ¶ 10. Over the four years he worked at Barrel House, his pay ranged from $14 per hour at the start to $17 per hour when his employment was terminated. *Id.* ¶ 11.

Belangu claims that he was not properly compensated. He alleges that Barrel House paid him at a rate less than minimum wage and failed to pay him overtime premiums for the hours he worked over 40 hours per week. *Id.* ¶ 14. He also claims that he performed deliveries for Barrel House via their third-party delivery application and did not receive all the tips he earned while making these deliveries. *Id.* ¶ 19.

Belangu sued Defendants MG Liquors, Inc., d/b/a Barrel House Liquors, and its owner Mesfun Ghebrelul under the Fair Labor Standards Act, 29 U.S.C. § 201 (FLSA), and the District of Columbia Minimum Wage Revision Act, D.C. Code § 32-1001 (DCMWRA). *Id.* ¶¶ 21–30.

In July 2024, Belangu filed a consent motion for settlement and notice of dismissal. *See* Mot. for Settlement (Mot.), ECF No. 11. As part of the settlement, Barrel House agreed to pay Belangu a total of $101,063.92. *Id.* ¶ 2. Barrel House agreed to make an initial lump-sum payment of $41,063.92. *Id.* ¶ 2.1. It will then make twelve monthly payments of $5,000 each. *Id.* ¶ 2.2. Of that total, 25% is wage related damages and 75% is liquidated damages. *Id.* ¶ 5. The Parties seek the Court's approval of this joint settlement. *Id.* at 1.

## II.

In most cases, parties can privately settle a dispute and voluntarily dismiss a case. *See* Fed. R. Civ. P. 41(a)(1). FLSA claims are different. Nearly 80 years ago, the Supreme Court recognized that FLSA claims cannot be privately settled like most other claims. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945); *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 114 (1946). The difference stems from the FLSA's "statutory policy" of protecting workers. *O'Neil*,

324 U.S. at 704.  In the Court's view, "allow[ing] waiver of statutory wages by agreement would nullify the purposes of the Act."  *Id.* at 707.  Given the public policy friction, courts often invalidate private FLSA settlements.  *See, e.g.*, *Carillo v. Dandan Inc.*, 51 F. Supp. 3d 124, 129 (D.D.C. 2014) ("[P]rivate settlements that purport to bar further suit against an employer in exchange for less than the full value of wages, overtime, and liquidated damages, to which the employee is entitled under the FLSA, are invalid.").

Yet there are still two ways parties to an FLSA claim can hammer out a settlement:  by agreeing to the supervision of the Secretary of Labor, 29 U.S.C. § 216(c), or submitting the settlement to be scrutinized and ratified by a "court of competent jurisdiction," *id.* § 216(b); *see also Carillo*, 51 F. Supp. 3d at 130–31 (explaining that courts in this district routinely review FLSA settlements *ex ante* to avoid "leav[ing] the parties in an uncertain position").

Belangu and Barrel House "have mutually sought judicial approval of their proposed settlement."  *Carillo*, 41 F. Supp. 3d at 131.  So the Court will review it.  But the Court will limit its review to those terms "addressing the compromised monetary amounts to resolve the pending wage and hour claims."  *Id.* at 134.  It will not pass on the enforceability of other provisions in the Agreement.  *See id.*

### III.

The Court analyzes FLSA settlement agreements in two steps.  "First, the Court must ensure that the agreement resolves a bona fide dispute—that is, it reflects a reasonable compromise over issues that are actually in dispute."  *Davis v. Kettler Mgmt.*, 21-cv-3351, 2022 WL 17146742, at *1 (D.D.C. Nov. 22, 2022) (cleaned up).  Second, the Court must confirm that "the agreement is substantively fair."  *Id.*  The Court analyzes each component in turn.

**A.**

The Agreement resolves a bona fide dispute.  "A settlement is bona fide if it reflects a reasonable compromise over issues that are actually in dispute, since merely waiving a right to wages owed is disallowed" under Supreme Court precedent.  *Carillo*, 51 F. Supp. 3d at 132 (cleaned up).  In this case, the Agreement resolves several genuine disputes, including the number of hours Plaintiff worked and whether his wages were improper under the FLSA and DCMWRA.  Mot. at 3.  The parties also "spent significant time discussing the nature and extent of Plaintiff's claims and exchanging documents in support of their respective positions."  Mot. at 2.  The Agreement reflects the parties have hashed out genuine disagreements.  Belangu is not merely waiving away his rights.  *See Trout*, 2023 WL 6583828, at *4.

**B.**

The Agreement also fairly resolves the substance of Plaintiffs' claims.  Three factors bear on the fairness of an FLSA settlement: (1) whether the settlement stemmed from employer overreach; (2) whether it was the "product of negotiation between represented parties following arm's length bargaining"; and (3) "whether there exist serious impediments to the collection of a judgment by the plaintiffs."  *Carillo*, 51 F. Supp. 3d at 132 (cleaned up).  The Court considers each factor below, "mindful of the strong presumption in favor of finding the settlement fair." *Id.* at 133 (cleaned up).

*First,* the Agreement shows no signs of employer overreach.  Courts commonly evaluate overreach by (1) comparing the plaintiff's position on the settlement amount to the defendant's position, and (2) examining the experience of parties' counsel.  *See Sarceno*, 78 F. Supp. 3d at 451.  The first factor does not apply here since the parties "have not provided an estimate as to the total amount of money" the plaintiffs and the defendants each claim to be owed.  *Id.*  So

"evaluation of where the settlement amount falls between the plaintiffs' position and the defendants' [is] impossible." *Id.*

Consider the other factor for evaluating overreach:  the experience of counsel.  When the parties' counsel have "extensive experience in pursuing and defending FLSA actions generally and familiarity with the underlying facts," courts can credit their representation "that the amounts agreed upon are a reasonable compromise." *Sarceno*, 78 F. Supp. 3d at 451 (cleaned up). Plaintiffs are represented by Andrew Bagley and Cori Schreider of Crowell & Moring LLP. Mot. at 5.  Both are "experienced counsel" and Bagley, who is senior counsel at Crowell, "has more than 25 years' experience in wage-hour matters." *Id.* at 4.  In their estimation, the Settlement Agreement is "fair and reasonable." *Id.* at 5.  Given that there is a "presumption in favor of finding a settlement fair," *Sarceno*, 78 F. Supp. 3d at 451, and that Belangu is represented by experienced counsel, the Court finds that there has been no employer overreach.

*Second,* the Settlement stems from "negotiation between represented parties" following an "arm's length bargaining." *Trout*, 2023 WL 6583828, at *3.  The parties negotiated for "months." Mot. at 4.  They exchanged information, records, and wage payments and "conducted thorough calculations." *Id.*  And the Settlement Agreement reflects a "compromise" following those extensive negotiations. *Id.*  Both parties were represented by counsel during this process. *Id.* at 4.  So from a process perspective, the Agreement "bears all the indicia of one that leads to a just outcome." *Carrillo*, 51 F. Supp. 3d at 134.

*Third,* the Agreement allows Belangu to recover now and removes litigation-associated impediments to recovery.  "[B]y settling now, [Belangu] will obtain a recovery without further delay and without incurred additional litigation costs and additional attorney's fees and costs." *Carrillo*, 51 F. Supp. 3d at 134 (cleaned up).  Under the Agreement's payment plan, Belangu

would receive his agreed upon compensation in one year, *see* Settlement Agreement ¶ 2, "which is undoubtedly quicker than this case could proceed to judgment given the typical time frame for discovery and the Court's heavy trial calendar." *Trout*, 2023 WL 6583828, at *6.

In sum, the parties' Agreement reflects a fair resolution to a bona fide dispute.

## IV.

The Agreement reasonably and fairly resolves the parties' bona fide wage-and-hour dispute.  So the Court will approve it.  A corresponding Order will issue today.


Dated: September 11, 2024                              _____

                                                       TREVOR N. McFADDEN, U.S.D.J.